The court did not err in overruling the motion for a new trial for any reason assigned.
 DECIDED APRIL 12, 1945.
Thomas L. Sumner filed suit against Alton Thomas, R. R. Dukes, doing business as Dukes Bus Lines, and American Casualty Company of Reading, Pennsylvania, to recover damages for an injury he sustained when his car collided with a bus driven by Alton Thomas for R. R. Dukes. When the evidence closed, the court, on motion of the defendant, directed a verdict against the plaintiff. A motion for a new trial was filed on the general grounds, and thereafter amended by adding a special ground enlarging upon the general grounds. The motion was overruled and the plaintiff excepted.
The evidence necessary to a decision is substantially as follows: The plaintiff testified that on December 19, 1943, he and his brother, James Elton Sumner, were traveling in a 1934 Ford sedan between Danville, Georgia, and Montrose, Georgia. They had been to Gordon to get a release for James Elton. "The Ford was a pretty old car and it would not have made more than 50 or 55 miles an hour. I had no warning that I know of before I got to this bus that there was anything in the road. I did not see any light of any kind, and when I first saw it I was probably as close as from me to you, which I judge to be about twelve feet. I didn't have time to stop before hitting it after I saw it, and when I saw the bus I swerved to the left, but it was too late. I did not get my car partly to the left side of the road before I hit the bus, but my car was about the center of the black line when I hit it. I was traveling on the right-hand side of the road, and I hit the bus about the center of the center line. I was hurt so bad that I don't remember the condition of the car at all. I had not been drinking and I was driving the car along the right-hand side of the road." He then described certain injuries which he received.
On cross-examination he testified that he left home with his brother on Saturday morning about 8 o'clock and arrived at Gordon about 10:30 or 11 o'clock, and left Gordon about 4:30 o'clock in *Page 352 
the afternoon and went to Macon, Georgia, where they went to a show. They left Macon around 11 or 11:45 o'clock that night. The collision occurred around 2 o'clock in the morning. The plaintiff did not go to any special place after leaving Macon, but probably stopped along the road coming home. The lights were burning. He was familiar with the stretch of road where the wreck happened but could not locate the point where the collision occurred. He could not say how long the straight strip of road was before he ran into the bus; he did not know whether or not it was more than half a mile; he did not know how far his lights would throw a beam, but they were good lights, and in his judgment would throw a beam 200 feet. His brother was asleep at the time of the collision and could not warn him that he was about to run into the bus. He had not had any sleep since he left home on the previous morning at 8 o'clock. Both of the headlights of his car were on. He did not "remember ever having seen the oil heater which you are indicating. I don't remember running over it while it was burning behind the bus at night. I did not see it. I did not see one sitting out 100 feet in front of the bus that night, and one 100 feet behind it. I have seen Mr. Dukes's bus and I am sure that the picture which you show me is a picture of it. I did not see the bus after I ran into it that night. I would recognize a picture of my car, and the picture you show me is my car. One of the pictures which you show me shows the condition of my car after I ran into the back end of the bus. There is nothing that I know of wrong with my eyesight, and I am used to driving at night. I am not accustomed to running up on things in the road and getting within twelve feet of them before I see them, if they have any signal. I do not know how many lights Mr. Dukes had on the bus. When I saw the bus it was the back of it. There were people bunched up there and they scattered. I saw more bus than I did lights. I couldn't have been much further than twelve feet from the bus when I first saw it, and I suppose the bus was standing still. I made an effort to go around on the left side of it, but I don't know whether I had sufficient space or not, but if there had not been anything on that side of the road I am sure I could have passed it if I had seen it in time. Since I was unable to see it until I got within twelve feet of it I was unable *Page 353 
to dodge it. I probably hadn't been over this particular stretch of highway for twelve months before I hit the bus that night. I couldn't say I traveled it every day or every week. The pavement is a twenty-foot cement pavement and I think that the place where I hit the bus it was a straight stretch of road; that is my best impression and best recollection. I don't know how long my brother had been asleep when this accident occurred, but probably thirty or forty minutes. I know Alton Thomas, and I did not tell Alton, after the wreck occurred, when he called on me at the hospital to see how I was getting along, that I ought not to have left in the condition that I was in. If I made any such statement I was unconscious and so far as I know I did not make that statement to anybody. Q. Didn't you likewise make the statement up there that night this occurred in the presence of the State troopers and J. B. Mathis and Theron Thomas that you never did see that bus? A. What I meant by that when I saw it it was too late to do anything."
The plaintiff was recalled, and testified: "I said that in traveling down that highway my automobile lights were throwing something like 200 feet. I am pretty sure about that. The first thing that I remember seeing before I hit the bus was the crowd just opened up. I had seen no lights before I hit it. When the crowd opened up I hit it. I did not have time to stop." Cross-examination: "I have had a good bit of experience driving at night with lights throwing beams about 200 feet. I have not necessarily seen men walking up and down the highway. You couldn't hardly detect cows and mules on the road at that distance. I have run over one or two cows. The first time that I remember seeing anything unusual in the road was when I got within twelve feet of the bus."
Mrs. Sam Hilbun testified for the plaintiff: "I was riding in the Dukes bus the night the Sumner boys ran into it on the highway. The highway is known as Federal Route No. 80. I was sitting in the bus about the third seat from the back, next to the aisle on the right hand side. I remember when the bus first stopped. It was making some kind of noise and Mr. Thomas stopped to see what was the matter and when he got out he found a flat tire. He did not make any effort to turn off the pavement at all. He just stopped. When he got out to see about it he saw he had a flat *Page 354 
tire. He did not move the bus any at all. With reference to fixing the tire he got the light out of the oil heater. I don't remember whether he got the light out, or took the whole heater out. This thing that you show me I don't know whether it was what he took out but I reckon so. I guess he took it out on the outside. He took only one heater out. The other heater was in the bus when the collision happened, but it wasn't lighted. Mr. Dickens tried to light it. We had had it lighted but it smoked so that it went out and when Mr. Dickens tried to light it again I guess the kerosene was out. I don't know whether these heaters make much light. I reckon it did when it was taken out. There was hardly any shock when the car hit the bus, and I think I was the last person to get off. The bus was still on the paved road when I got off and sat down by the bus, and I thought maybe if we had been a little farther out of the road he wouldn't have bumped us. I did not see or smell any liquor around there. I saw some fire, some grass caught fire where they had kicked a light or something out of the road. It was caught afire after I went back of the bus. Somebody kicked a lamp over or something and caught the dry grass afire. The lamp was back of the bus somewhere when I got out of the bus and not so far from the bus. There was no fire on the pavement, I don't remember about that. I think that is what they kicked out of the road, and that is what caused the fire. I don't remember smelling any kerosene or anything. This heater which you show me wasn't 100 feet up the road when I saw it. I don't know whether this part shown me looks like the thing that sticks up out of those heaters. I just saw it after it was lighted. I do not know how much blaze comes up from one of them when it is lighted. The blaze I saw was from the one that caught afire and it made a lot of blaze. It is a heater and only one of the heaters taken out of the bus until after the wreck."
On cross-examination she testified that she was sitting on the bus about three or four seats from the back and did not get off the bus until after the collision; that she did not take a nap; that a couple of young ladies got off the bus after it stopped and went to Dublin on a passing truck; that she did not pay any attention to trucks or automobiles passing on the left-hand side of the bus while it was stopped; that she and others were talking and did not pay any attention when the ladies got off and left; that she did not pay any *Page 355 
attention to the car of the plaintiff until after it ran into the rear of the bus, "all of the lights were on on the bus — the headlight, the taillight and the inside lights;" that she did not know what Alton Thomas did when he got off the bus; that he had been working on the tire some ten or fifteen minutes before the collision occurred; that she did not know where Thomas placed the stove; that she did not see the plaintiff run over the stove; that when she first saw it, it was run over; that it was not run over when it was carried out of the bus; that when she saw it again it was in the shape "that it now is," and that she imagined someone had to run over it or smash it with something in order to get it in that shape; she had never paid any attention to such heaters when lighted without the top on and did not know how much flame comes up, whether it is twelve inches or eight inches; that the stretch of road where the collision happened is straight and it looked to the witness to be about as straight as it can be for about a mile; that it was not cloudy that night; it was cold and that the parties on the bus were cold and desired the tire fixed quickly. She further testified that she did not hear the car before it hit the bus; that the first noise she heard was when she felt the force of the collision; that she did not know how fast the plaintiff was driving; she looked at the plaintiff's car and it was "in a pretty bad fix. . . There was nothing to hide the bus that night and keep Jack Sumner [the plaintiff] from seeing it when he came down the road. The bus was in the road. It was sitting on the side of the road and there was plenty of space for trucks and automobiles to go by. I have no idea how long I stayed there after the collision. . . I first saw the fire on the left side of the road." She testified that the Greyhound bus came by after the collision and stopped; the State trooper was there before it left; that she did not know whether anything was moved out of the road for the Greyhound bus to pass; that she did not see anything moved. "I first saw the fire on the left side of the road after I walked around there and saw that lamp where they had kicked it out. I saw fire on the left-hand side of the road after this was kicked out. This is the first thing that set the grass afire. I saw them start the fire when this was kicked out. I did not see them start a fire over there before that. I was sitting on the inside of the bus before that. I saw a light out there but I could not tell what caused it. So far as I know Alton might have built a fire *Page 356 
on the shoulder of the road. This was not before the collision. I didn't notice the fire out there until after the wreck."
On redirect examination she testified that she did not go out of the bus until after the collision and did not know whether or not there was a red taillight on the back of the bus throwing the light a distance of 100 feet; she did not notice the shoulder of the pavement and did not know how wide the shoulder was; it was covered with grass and anyone could have seen the shoulder of the road. She would not say that one could look at the shoulder of the road and say whether the bus could be driven off on it; she did not pay any attention to it that night; she had been back to the scene since the collision and did not think the bus could get clear off the pavement but there was some room where the bus could get off the pavement.
Dr. E. B. Claxton, sworn for the plaintiff, testified that he treated the plaintiff at the hospital around 4:30 in the morning. "I would not say this boy was drunk that night, but we could get the odor of whisky. I wouldn't say he was drunk because the shock, the lick, the blow, the concussion of his brain, the shaking up, would cause me to say that he wasn't drunk. Almost any of the injuries named could have produced pain. I do not know where the odor of whisky came from. I couldn't say whether he had it in his stomach, or his clothing, but we could smell whisky while he was being examined." And on cross-examination he testified: "I think the State troopers were there that night, making an investigation. They were probably there at that time. When I had this boy on the operating table I am not sure just what questions they asked me, but I had Miss Curry and Miss Riner double check me as to the liquor. We all agreed that there was liquor. We got the odor of it. On account of the wreck I couldn't tell whether or not the whisky was responsible for any of his mental dullness. I was certain that we caught the odor of liquor. When a man is driving a Ford automobile with lights, which he says will throw a beam 200 feet in advance and is coming down a straight stretch of road, and there is a bus parked on the right-hand side of the road, which bus is ninety-six inches wide, and some twenty-six feet long, and possibly some nine or ten feet high, and if the man was under the influence of alcohol I would say that whether or not alcohol had any effect on his ability to see the bus as he approached *Page 357 
it on a straight stretch of road at night, with lights that would throw a beam 200 feet would depend on how great the influence of alcohol was. In answer to your question that if T. E. Sumner testified that he didn't see the bus until he was within twelve feet of it, and later was found in the condition that I found him in, whether or not alcohol had anything to do with his not seeing that bus before he got within twelve feet of it, I would say that if he were looking straight down the road he should have seen it, but he might have had some other cause to divert his attention. If he were looking and was normal I shouldn't think there would be anything to keep him from seeing it." On redirect he testified: "With all the injuries he was more or less dazed but he could tell me that he had some pain. I wouldn't say that he was drunk but there was some whisky there and he was mentally confused. He had two terrible cuts over his eyes. The injuries I have described could have caused him to have been confused mentally. I think the blow on his head could have confused him. I don't know whether it would have lasted that long. He could have been confused mentally if he hadn't had a drink. There was a concussion of the brain."
R. B. Leach, sworn as a witness for the plaintiff, testified that he was a passenger on the bus on the night the plaintiff ran into it. He got off the bus before the plaintiff ran into it; the bus was parked about eighteen inches from the center line; none of the four wheels of the bus were off the pavement; he did not know whether there was plenty of room for the driver to park the bus off the pavement on the shoulder; he saw the plaintiff's car when it hit the bus; he was on the front seat inside and got off immediately; the four wheels of the bus were still on the pavement and had not turned off the pavement at any time after it was stopped. "I saw two heaters that night that looked like the two you show me. There were two heaters on the bus. The driver took one off the bus and at the time I saw it it was sitting down by the wheels to furnish light to see how to change the tire. I don't know whether that was where the boys ran into the heater or not. I remember seeing the heater after I got off the bus, the first time, it was behind the car on the grass. It was not 100 feet up the road. It was behind the car. The driver did not put any light back up the road any piece. I couldn't tell you why that was done there at *Page 358 
the time. The other heater was inside of the bus. We were using it for heat and it was lit at the time of the wreck. The heater that was broken up was directly behind the wrecked automobile after the wreck. I don't know how far that was from the end of the bus. It was right behind the wheels furnishing the light for them to fix the tire before the wreck. I don't know what they did with it after that. I went back to the bus and sat down."
On cross-examination he testified that he got off the bus after it stopped and re-entered the bus about the time the jack was being established under the rear wheel of the bus; that he did not know what transpired from the time he re-entered the bus until the time of the collision; that he did not know where the flare was placed while he was sitting inside the bus; that he did not see a fire built on the side of the road. "All of the lights on the bus were on and it was a fair night. The road was a good long stretch of straight road. It is reasonable to suppose that Sumner [the plaintiff], who was driving the Ford could have seen the bus over a half of mile before he hit it. All the lights were on. When I saw the flare it was by the wheel. I do not know where it was when it got smashed up. When I got out of the bus I found that Alton Thomas had parked it as close as he could to the edge of the pavement One truck passed by and it had plenty of room and there was nothing to keep anybody from passing on the left-hand side of the Duke bus."
Mrs. R. B. Leach testified for the plaintiff that she was on the bus the night the collision occurred and did not know how far from the center line the bus was; that the wheels were all on the pavement when she got off the bus; that the driver had a couple of lamps that came out of the heaters on the bus, and that two of them were taken off the bus and both were burning when they took them off and she never did see them back on the bus; that she did not know whether or not they were brought back into the bus; that she saw one of the Sumner boys (meaning the plaintiff and his brother) inside the car and the other one was sitting on the road bank; that she was told that the one on the bank came out first; she was certain that four wheels of the bus were on the pavement when she got off the bus.
On cross-examination she testified that she did not get off the bus until after the collision; that she was not sitting with Mr. *Page 359 
Leach that night; that after the bus stopped the driver came in and got one of the heaters; that she did not know who took the second heater out and that she did not know where the heaters were finally placed; that all the lights on the inside of the bus were on, but she couldn't say whether the outside lights were on or not; that the road was reasonably straight; that the school bus was painted yellow; "I couldn't say about the length of it." She did not know the weight or length of the bus and did not know the number of passengers on it, but that there was a load; that after the bus stopped some automobiles and trucks passed; that she did not know how much room they had but they passed and they could get by all right without any trouble.
M. C. Carter testified for the plaintiff that he was a surveyor and surveyed the place that was pointed out to him where the Sumner boys had a collision with the Dukes bus; that he made a measurement of the side of the bus. "The side of the bus from the edge of the bus to the edge of the body is approximately eight feet. It might have been one inch one way or the other. From back wheel to back wheel was fifteen feet and nine inches. I would say that the width of the rear axle from wheel to wheel is sixty inches, the wheels were narrower than the body. They sat within the limits of the body. The little lights on the corner of each side of the bus were maybe four or five inches lower than the top of the body. They are side lights. I recognize this picture as being similar to the bus I measured. One of the lights I refer to is on the corner and it shines slightly out to the side. They were not bigger than a hen's egg and they were approximately eight feet from the ground. I measured the shoulder off the pavement, the flat part of the shoulder is seven feet from the edge of the pavement to where it began to slope. It didn't slope until seven inches from the shoulder and there is usually a two-inch rise from the edge of the pavement and then they begin to slope. They do that to keep from washing. There was room for a car to get off the pavement but at night it would be sort of dangerous. It is dangerous to stop on the pavement too." And on cross-examination he testified: "I made the tracing of the blue print which you show me. The pavement was twenty feet wide. The ditch outside of the shoulder was three feet eight inches deep. From the point which you show me the distance was 1.6 miles towards Montrose *Page 360 
to the point of the accident. North to the point of the accident there was a straight stretch of road, 3590 feet, which is absolutely straight. There is nothing from this point of beginning which you designate, to the place of accident to obstruct anybody's vision. South of the point of the accident the closest road to lead off on was a little side road 500 feet from where the accident occurred, and this little road is a farm road. It could have been called a farm road. There is a house on the side here a few yards. I guess I made this survey and these measurements about two weeks ago, sometime in July. I did not, of course, measure the shoulder up there on the 19th day of December, the date of the accident. They are just like they were, I think. I don't think anything has changed. When I made the statement that an automobile could drive over the shoulder in the day time, but it would be dangerous at night, I meant that you really couldn't tell where you are going so well, when you are going over a shoulder when the grass is up. I have been told that a bus with 33 passengers on it is hard to handle, but I don't know. I measured a 1934 Ford. It was fourteen feet and four inches long and five feet six inches high. These measurements compare with the overall length of the bus. The 1934 Ford is fourteen feet four inches long and the bus is twenty-eight feet long, so the bus is nearly twice as long. I made a test with this flare to see how high the flare will go without a top, and it went about six inches high, a round flame nearly as large as your hat. I didn't take the top out. I lighted it as it is now and it will make a round flare about six inches high. I made this test at night. It could be seen, I imagine, 200 or 300 yards after it was set out, where you could see it in an open place. It makes a big round flame and looks like a stove lamp or one of those oil burners, that you have around heaters. It is not a regular flare. I cut the little pieces of pasteboard, which you hand me, for you. The map which you show me is drawn on the scale of one inch to ten feet, the upper part of it is. The pieces of pasteboard are drawn on the scale of one inch to ten feet. The pieces of pasteboard are drawn on the same scale to represent the size of the bus and the size of the automobile that was involved in this collision. When put in place on the map they correspond with the scale on the map, 3500 feet is nearly half a mile. I would have to figure that up. There are 5280 feet in a mile, and it would *Page 361 
seem that it is about two thirds of a mile, and over a half mile. Explaining my drawing over here on the south side of the cross section of the highway, this — where I am indicating — shows the pavement twenty feet wide and seven feet shoulders, where I am indicating, the south ditch they were parked near. The ditch is three feet eight inches deep and from the shoulder to the bottom of the ditch is about eleven feet. This side goes out without coming back up, but this side here is 3.8 feet deep and shows the fall of the road from the point of the accident on back. It is a regular continuous fall." Redirect examination: "I made a test with this heater, and I can light it if it has got any kerosene in it. I can't swear that they had this heater lit up that way that night. I don't know. They say they did. I see smoke coming from this heater which I lighted. I reckon it makes about as much smoke as light. I have never seen it tested whether the smoke would tend to obstruct the light if it keeps on smoking. Smoke will cloud a light and on the ground would rise too. I don't know whether it would have covered the back end of that bus after awhile if it kept up some considerable time. You are asking me questions I don't know anything about. They showed me where I am pointing as being the place where the wreck occurred. Up here is some woods that start off this way, that shows south. This is the north side of the road, and is something like 600 feet from this point I show you to this point, but it is all straight. From a point west of the accident it is 3580 feet to the point of the accident, and is a gradual down grade all the way, and it falls from the point of the straight road, which I show you here, thirty feet eight inches, and is a gradual fall all the way down, and it falls from the point of the straight road here thirty feet eight inches. [Q.] `A man's lights from the car might be focused going down hill all of the way, they might be focused over that bus?' [A.] Both of them are focused down the hill. [Q.] `Wouldn't it depend on the way his lights are set on his car as much as anything else?' [A.] The car is going down hill and the road is going down hill, but if his light is out of adjustment that might have something to do with it But I do say the car and the road, both of them, would be going down grade. The shoulder of the road was hard, but I imagine in wet weather it would be soft because there is a branch there. You asked me if I didn't see a rut all up and down. There is a rut about *Page 362 
four feet here that looked like a truck came very near bogging down on this shoulder — it was off of that pavement and whoever stopped there stopped off the pavement but he nearly bogged down."
It was stipulated that Henry Walden was a State trooper and an expert on traffic. He testified substantially that on the night of December 19 he was called to investigate a collision between the plaintiff's car and the bus of the defendant Dukes; he arrived about 3 o'clock in the morning; trooper McKinnon was with him when he arrived; "The car was up under the bus in this position; that is the position we found the car. The bus was almost straight up and down the road. The car was sitting in the position indicated. With reference to the pavement, part of the bus was on the shoulder and part on the pavement. The driver's side, the right hand side of the bus was on the shoulder. We found one flare burning right here, as I indicate. The flare was on the side of the road. There was another flare that had been run over and was sitting right on the edge of the shoulder of the road. The flare that had been run over was about 75 feet behind the bus. The flare which you show me looks like the one that was run over, the other is the flare that was burning down towards Dublin. When we reached the bus they had two flat tires. A man was finishing fixing them when I got there and was tightening the lugs on the wheels. I did not know Mr. Sumner and never saw him until that night. When I got there they were loading him in the ambulance. They brought Mr. Sumner and his brother to town in the ambulance. I have been on the State patrol for six years, starting with them when they had been going about a year. I have had experience in observing bus transportation. I stated that I believe it was about 2:30 when I got this call. I don't remember exactly. I made a record of the number of passengers that were on the bus and there were 33. Whether the bus was this far over on the right-hand side of the road as it could get with that number of passengers, I don't know how much weight that shoulder could stand. I wouldn't have attempted to pull it any further with that number of passengers because it might have been soft. My explanation of the Ford sticking up under the back end of the bus at an angle would be that it seems that when the car run over that flare maybe the driver pulled around out of the way of the flare and ran up under the corner of that bus. The car was sticking *Page 363 
in at an angle just like I show it. My conclusion was that running over the flare deflected him momentarily. The parking lights and taillights of the bus were burning. I don't remember how many taillights it had. I don't know whether the taillight on the left corner was burning or not. I don't remember whether the rear lights were burning or not, and I don't recall whether the inside lights were burning or not. The weather that night was clear; it wasn't raining. After we finished our investigation we went to the hospital to talk with the driver of the vehicle, and he was hurt pretty bad, so we didn't talk to him. We went in the X-ray room where they had him lying on the table, and spoke to him. He was in too bad a condition to question at that time. The driver of the car had the odor of alcohol on his breath. I asked Dr. Claxton and his two nurses to check on that, which they did, and in making my report I made an entry on my report to that effect. There is no stretch of road from Dublin to Macon as straight as this particular stretch. There are quite a few straight stretches between here and Macon, but that is one of the straightest. I imagine there is more straight road there from Montrose about three miles than any other place. Mr. Sumner had a long stretch of straight road before he came to the place where the bus was parked. I would say it was over half a mile. There was nothing on that stretch of road to prevent a man in normal conditions from seeing the bus. I did not have any difficulty in seeing it when I drove up there. If there was a car coming which prevented the driver of the car from turning to the left none of the witnesses saw it, as I asked them. When I got there I found the ambulance parked right side of the bus, right in the middle of the road and they were loading these two fellows on it. We did not have to drive around the ambulance. We parked in front of it. We could have driven around the ambulance, by driving on the shoulder and gotten by. Without the ambulance being there there was plenty of space for trucks and vehicles to pass by on the left side of the highway. The bus was four feet to the left side of the center line and I think about three feet of the bus was off of the shoulder. The highway is twenty feet wide. The front and rear right wheels of the bus were on the dirt of the shoulder. The Ford was completely demolished, and how fast a 1934 Ford will run is according to what shape it is in. Some of them will run pretty fast. Assuming *Page 364 
it was in good shape, I had one one time that would do 85. I couldn't say from what I saw there at what rate of speed this Ford was running. The bus was standing still. Any damage that was done was brought about by force from the impact of the Ford. I don't remember seeing any fire. I remember the flares as that is the first thing we look for. These flares were put in the proper position as advocated by the State Safety Department. When we got there one flare had been run over and wouldn't burn. The other one was burning good. I couldn't say how far off you could see that flare that night. The regular flare furnished for buses or trucks is a round affair that you fill with gasoline and it burns with a little wick about the size of a thumb. You have more fire with this one than with the regular flare and this one would put out the most light." He could detect the odor of alcohol in the plaintiff's car; he didn't notice any bottles.
On cross-examination he testified that he did not know what happened before he arrived at the scene of the collision, and did not know whether any light was burning on the bus when the collision happened; the damaged burner was about 75 feet from the bus and was not burning; he did not see anyone take it there, and it could have been done after the collision; the ambulance was parked opposite the bus when he arrived; he could have driven around by driving on the shoulder; he did not observe anything that would have kept the bus from being driven off the shoulder; the shoulder was not muddy; the back end of the automobile could have been thrown to the side from the impact; the car would be liable to turn any direction from such an impact. It was the opinion of the witness that the flare had been run over, although the damage to the flare could have been done with a hammer or something else. In the opinion of the witness a 1934 Ford in good shape could do 85 miles per hour, but he did not know anything about the condition of the plaintiff's Ford. The Ford car was rammed up past the windshield in the back end of the bus.
Alton Thomas testified for the defendant that he was driving the bus on the night of the collision, that the bus was a 32-passenger bus and had chairs in the aisle; that he left Macon with 35 passengers; some of them had gotten off before the wreck; that the passengers were defense workers; that the two back tires of the bus went down and he stopped to repair them; that the two left-hand wheels *Page 365 
of the bus were left on the pavement; that he did not know the condition of the shoulder as he did not figure that he had sufficient room to drive the bus entirely on the shoulder; it was dark, but fair. He took two heaters out of the bus and lit them. He placed one of the heaters in front of the bus and the other one a little over 100 feet back of the bus; he stepped the distance after the collision He believed there were six lights on the rear of the bus; the inside lights were all burning and there were four lights on top of the bus; the headlights were burning — on dim; the bus lights were never off from the time the bus started until the collision occurred; the flares were burning from the time the bus stopped until the collision; his brother and J. B. Matthews helped fix the tires; two ladies, Miss Reese and Miss Willis, got off the bus and were trying to start a fire on the left side of the road; while the tire was being fixed trucks passed; the first truck was a big gasoline truck; three passengers, a Mr. Carter and two ladies, went to Dublin on one of the trucks; in a few minutes another gasoline truck came down the road and passed without difficulty; the bus was stopped about two feet off the shoulder and about six feet on the pavement, leaving something like four feet to the center line; "I first noticed the Sumner car coming when he came over the hill. We could hear him before he came over the hill. I don't know how long the straight stretch of road at that point was, but it was way over a mile from one end of the stretch to the other. It was three fourths of a mile between the top of the hill where he could see me. When he came over the hill I was under the bus and I got out from under the bus and went to the flare and waved the flare for him and set it down on the center line. I heard him coming and ran back of the bus and waved the flare at him. I didn't have much time to do much waving because he was coming so fast. He did not slow down a bit. He hit the flare with the wheel and flung it around. After he ran over that he came on and ran into the bus. When he ran into the bus I was just about even with this flare because I had just set it down and run off the highway. The ditch on the right-hand side of the highway was between three and four feet deep. I know when I stepped off the bus it seemed like I was stepping in a ditch and I almost stepped into the ditch then. After the Ford ran up under the back end of the bus I went up to it. We got Jack [the plaintiff] and carried *Page 366 
him on the side and then started getting his brother out. I know Jack Sumner and Jim Sumner. I know them both well and have been knowing them all of my life. They were very good friends of mine. We got Jack out of the car first. He made a statement to me that night; he said he didn't see the bus and he said he ought not to left Macon that night. As near as I can — his words were: `Legs, what did I hit?' and I said: `You hit a bus.' His head was in my lap and we were trying to put some quilts under him and he said: `I ought not to have left Macon in the shape I was in; look what I have done.'"
The Dukes bus was a school bus but was being used to haul war workers. Alton Thomas testified further: "I detected the odor of whisky on both Jack and Bud Sumner that night. I saw some bottles in the car; but I can't say that I saw any whisky. I don't know what went with the bottles. It seems like I saw one of the State patrolmen pick one up and lay it back. There were some broken bottles in the glove compartment — some beer and some whisky bottles. The Sumner boys said they had been to Macon that night. I would say that from the time I stopped the bus to repair the tires until the time of the collision it was about twenty-five minutes. All the passengers except the four, whose names I gave you, were inside of the bus when the collision occurred; me and four passengers were on the outside when the collision occurred."
On cross-examination he testified: "In fixing the tires I could see from the fire that was built on the side of the road over there. I could have fixed the tires in the dark. There was a fire on my left-hand side of the road, and the fire was across the road where we were fixing the tire. I believe the Sumner car must have been making 60 miles an hour. I know it didn't take but a mighty little bit to get from the top of that hill to where we were after we heard it, and it is about three fourths of a mile from the top of the hill to the point of the collision. It took about forty-five seconds. We heard him before he came over the hill and that is when I got up. It took him a mighty little time to get from the top of that hill to where we were after we heard it, and it is about three fourths of a mile. We heard him before he came over the hill and that is when I got up. It took him a mighty little time to come over the hill and mighty little time to get to where we *Page 367 
were. At the time the Sumner car came over the hill I wasn't working on the tire, because I had already got up. I heard him when he was coming. I had already gotten up to wave this flare, and I did it because a man driving that fast naturally wasn't going to notice it. I did not think there was something he couldn't see, but thought something was wrong when a man was going that fast. The car sounded like he was doing all he could do, and this was more than half a mile away. When I first heard the car I had time to get up the road 100 feet and wave it at him, and get out of the road. It took me half a minute or less to do this. At this time I had this light and the other one and all of the lights on the bus. I will swear positively that I took both of the heaters off of that bus. I admit I stopped the bus four feet from the center line. You know when you pull a bus with 33 passengers off of that shoulder you are liable to roll that bus down in a hole and kill 33 people. I said I was two feet off of the shoulder."
A diagram was introduced in evidence by the defendant showing the road at the point of the collision and a straight stretch of road 3590 feet in length from the back of the bus. From this distance back of the bus the road was straight and there was nothing to obstruct the vision of one approaching the bus from the rear provided there were sufficient lights on the bus and around it. There were a number of photographs introduced showing the condition of the Ford car and of the bus after the collision. The picture of the bus shows a rectangular glass window in the back end of the bus, and on either side of this window were two other glass windows, these three windows covering a total area of approximately one fifth of the outside area of the back end of the bus, the windows being located about half the distance from the bottom to the top of the body of the bus.
We have given the evidence in substance and in many instances in detail, in order that we might, in the light of it, discuss the contentions. The petition alleges three acts of negligence: (1) That the bus did not have the "red taillight" required by the statute under the Code, § 68-302; (2) that the operator of the bus gave no warning; (3) that the bus was parked *Page 368 
within eight feet of the center line of the highway. The evidence presents two questions for decision: (a) Does the evidence sustain the allegations of negligence, or either one of them? and (b) if such negligence is established from the evidence, then did the plaintiff know of such negligence on the part of the defendant or could he by the exercise of ordinary care have become aware of such negligence and thereafter by the exercise of ordinary care have avoided the consequences of the defendant's negligence?
The plaintiff nowhere states in his evidence that the bus was not equipped with lights as required by the law. Neither does he state that an additional flare light was not placed behind the bus after it was parked. The extent of his testimony is that he never saw any lights at all; that he did not even see the bus itself until he was within twelve feet of it. He did testify that his car was equipped with proper headlights which cast a beam a distance of 200 feet.
As to the other act of negligence, it is conceded by the plaintiff that the bus was parked within eight feet of the center line of the highway. The evidence is undisputed that the bus was a passenger-carrying school bus painted yellow; that the night was clear and cool; that the dome lights inside the bus were all burning; that there were three large glass windows in the back of the bus through which the lights from the inside could be seen for a considerable distance; that from the point of the collision to the point in the road for over half a mile from the direction from which the plaintiff was approaching the bus the road was practically straight with a very slight decline; that all the lights on the bus — taillights and other lights — were burning; that in addition thereto there was a flare behind the bus, either immediately back of the bus or within 100 feet back of the bus; that a number of witnesses who were asked the question stated that under all the circumstances there was no reason at all why the plaintiff in the exercise of ordinary care could not have discovered the bus and avoided the injury; that the plaintiff was driving 45 miles per hour, according to his own admission, with no defect in his vision, and approaching a stopped bus, did not slow down, did not sound any warning, and did not see the bus or any of the people behind it until, in his own language, he testified that: "There is nothing that I know of *Page 369 
wrong with my eyesight and I am used to driving at night. I am not accustomed to running up on things in the road and getting within twelve feet of them before I see them, if they have any signal. I do not know how many lights Mr. Dukes had on the bus. When I saw the bus it was the back of it. There were people bunched up there and they scattered. I saw more bus than I did lights. I couldn't have been much further than twelve feet from the bus when I first saw it, and I suppose the bus was standing still. I made an effort to go around on the left side of it, but I don't know whether I had sufficient space or not, but if there had not been anything on that side of the road I am sure I could have passed it if I had seen it in time. Since I was unable to see it until I got within twelve feet of it I was unable to dodge it. . . The first thing that I remember seeing before I hit the bus was the crowd just opened up. I had seen no lights before I hit it. When the crowd opened up I hit it. I did not have time to stop." The evidence further shows, undisputedly, that between the time when the bus parked and the time of the collision, a number of motor vehicles had approached the bus from the rear and passed to the left of it without difficulty, including automobiles and large oil trucks, and none of them had any difficulty in passing. So far as the evidence shows, the same conditions prevailed when these conveyances passed as prevailed when the plaintiff ran into the bus.
As to the first two allegations of negligence, the evidence wholly fails to establish either of them. While it is true that no witness positively testified that the taillight measured up to the requirements of the statute, still none of the evidence shows that it did not. There is evidence that the taillights were burning and the presumption is that they met the requirements of the statute. The burden was on the plaintiff to show that they did not. There is considerable evidence as to just how far to the right of the center line of the road the bus was parked or could have parked safely, and there may be some question as to whether the driver of the bus complied with the provisions of the Code, § 68-314, as construed by the Supreme Court in Kelly v. Locke,186 Ga. 620 (198 S.E. 754), but under the facts of the instant case we think it might with propriety be conceded but not decided that the driver did not meet such requirements. Even then we think the court properly directed a verdict for the defendant. The fundamental law of *Page 370 
this State underlying all acts of negligence of this sort is set forth in the Code, § 105-603, as follows: "If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover." This court said in Georgia Power Company v.Maxwell, 52 Ga. App. 430 (3) (183 S.E. 654): "The rule of law that in order for the plaintiff to recover he must have exercised ordinary care to avoid the consequences to himself of the defendant's negligence is not limited to negligence which may have been actually discovered, but it extends to negligence which might have been discovered by exercise of ordinary car by the plaintiff." The question as to just why the plaintiff failed to discover the bus until he was within twelve feet of it, naturally arises in one's mind — the night was clear, the road was straight, his visibility was good for over a half mile, and the decline in the road was slight. It would seem that an ordinary person, in possession of all his faculties, in the exercise of ordinary care, would have seen the bus. The evidence shows that the plaintiff had not had any sleep for upwards of 18 hours. His brother, who was sitting beside him, had already fallen asleep. Then too, there is considerable evidence that the plaintiff had been drinking. However, he denied this and that would make it a jury question. So if we are permitted to speculate, we might infer from the evidence that his senses were numbed and confused from lack of sleep.
We are mindful that it is only in clear cases that the court has authority to decide questions of negligence as a matter of law. It is generally a jury question. But where, in the evidence, there is no reasonable ground for two opinions it then becomes a matter of law and not a question of fact for the jury. Under the record in this case there is no reasonable ground for but one opinion and that is that the plaintiff by the exercise of ordinary care could have avoided the consequences to himself caused by the defendant's negligence, if indeed the evidence shows any negligence on the part of the defendant. Taylor v.Morgan, 54 Ga. App. 426 (188 S.E. 44). We doubt if there is any one subject in our law that has given rise to as many decisions and as much research as that of negligence, and it is a general rule that usually each must stand or fall on its own fact. We will not cite at length any further statutes or decisions except to call attention to the decisions which the plaintiff cites. We do this without comment further than to say that on a *Page 371 
close study of the cases they are not in conflict with the decision in the instant case. They are: Bach v. Bragg,53 Ga. App. 574 (186 S.E. 711); Payne v. A. B. C. TruckLines, 61 Ga. App. 36 (5 S.E.2d 590); Wilson v.Pollard, 62 Ga. App. 781 (10 S.E.2d 407).
Judgment affirmed. Broyles, C. J., and MacIntyre, J.,concur.