31593.   DAVIS *v.* TANNER *et al.*

DECIDED MAY 29, 1947.   REHEARING DENIED JUNE 18, 1947.

*William G. McRae, W. W. Mundy Jr.,* for plaintiff.
*C. C. Bunn, Henry A. Stewart,* for defendants.

FELTON, J. The evidence for the plaintiff reveals that there were six persons occupying the automobile in which the plaintiff was riding at the time of the accident. Four were in the back seat and two were in the front seat. They all testified at the trial with the exception of Richard Watts, the driver of the automobile, whose absence was explained by the fact that he was in a hospital in Washington, D. C. The testimony of the other five persons was almost identical and with regard to the accident it was essentially: "I know nothing about the accident," or, "When we had the collision I didn't see what we ran into," or, "I was in the back seat of the automobile that ran into a bus on the night of January 17, 1946, at the intersection of the highway and Bellview-Fish Creek Road, sitting on the right side. I didn't see the bus before it was hit. The car was going about 45 miles an hour. I judge that from my experience in driving." The only other material evidence offered by the plaintiff as to how the accident occurred was that of T. R. Lovern Jr., the driver of an automobile which was approaching the intersection at the time of the accident, traveling in the opposite direction to that of the automobile in which the plaintiff was riding; i.e., he was driving from Rockmart toward Cedartown. He testified: "I was on the highway between Rockmart and Cedartown near the intersection

of Bellview-Fish Creek Road, going toward Cedartown in an automobile. The car in which I was riding collided with a Russell & Tanner bus. Photograph marked Exhibit A is a photograph of the scene where the collision occurred. The bus was parked here (indicating on the photograph) and I was going home, and about the time I got there, this car hit the back of the bus, he had his wheels cut to make this turn, and just as I got there this car hit the bus and knocked the bus into my car. This area off the highway to the right is large enough to pull off; I mean there is room enough there for a bus to pull off the highway. That is about the length of the bus from the point of the collision, something like 20 or 25 feet, or the bus could have driven down that road. I first saw the bus when I came around the curve on the straightaway. I don't know how far I was from the bus when I came around that curve, I imagine I was a little farther than from here to the Utopia Club across the street over there. When I came around the curve and first saw the bus it was stopped on the side of the road, with the two right-hand wheels off the pavement, and his wheels were already cut to make this turn across the road. The wheels were just enough off the pavement to run off the edge of it and make the turn there. I saw a lady get off the bus. About the time she got off I started by her and this bus came right across into me, just about the time I got there. I didn't see the car that hit the bus, because I was watching the bus lights, he had already cut his wheels and naturally the lights were just a little bit on my side, so I dimmed my lights and I was watching him. I was driving 40 or 45 miles an hour before that, and I slowed down to about 35 miles an hour. As to whether the bus was stopped or moving when I first saw it, I couldn't tell till I got down close to it; it was stopped when I got there and the lady was getting out. I couldn't tell whether the bus moved after I first saw it or not. When I first saw it, all I could see was the lights, and when I got down there to it his wheels were already cut in the side road. I didn't see any change in the beam of light after I first saw it and before the collision; they were pointing in the same direction when I had the collision as they were when I first discovered it. . . This is a true picture of the road there, taken going toward Cedartown. I am familiar with this road there, I travel it a good bit. This picture reflects

a dip in the road coming up to the point of the collision from Cedartown. You ask if the lights of a car coming out of that dip and on up to level ground would be likely to be reflected solidly on the highway at that point. I couldn't say about that; naturally, coming up an incline, your lights would be reflected up a little. That was the direction from which Richard Watts' car was coming. After the accident I stayed there 30 or 40 minutes. The negro's car could not have passed the bus on the left side, if he had he would have run head-on into me. I don't know exactly how close to the center line was any portion of the bus, but his right wheels were off the pavement on the right side and he had cut his wheels to make the turn and was standing there. I guess the nearest portion of the bus was not over three feet from the center of the highway, that was his left front. If the driver of the negro's car had gone around the right side of the bus he would have gone into a deep ravine over there. There was not enough room between the bus and the ravine for the car to have passed. The first part of that night it had been snowing, but it had stopped, it had cleared up a little bit. My headlights were functioning. I don't think the weather conditions were such as would have reduced the visibility of a driver. The pavement was all right, it was not wet, it turned cold and the wind blew, the stuff had melted but the pavement was not what you would call wet." The evidence for the defendants, briefly summarized was as follows: W. T. McCown, Sheriff of Polk County, testified: "I am familiar with the busses belonging to Tanner & Russell. If a bus similar to those busses stopped at the intersection of the highway and the Bellview-Fish Creek Road, and I were approaching it in a car coming from Cedartown, I could see that bus for half a mile if I were watching. You could see it anywhere in the dip I spoke of. From a point half a mile away, the bus would remain in view until you reach the intersection. . . If you are half a mile away from a bus at night, I would think it would be difficult to tell whether the bus is moving or standing still, if the road is smooth. If the road is rough, it will doodle around. The dip I spoke of is shown at this point on the photograph identified as having been taken from the intersection looking toward Cedartown. I imagine it is 100 yards from where you come out of the dip to the intersection of the highway and Bellview-Fish Creek Road. At night,

just before you go into the dip, you couldn't tell whether the bus was stopped or moving if its lights were not varying around. As you come out of this end of the dip (indicating), you could tell whether the bus was moving or still by whether you were gaining on the lights faster than you ought to, but if the lights were going with you, you wouldn't gain so fast. That's the only way I imagine you could tell." W. C. Williams, a passenger on the bus the night of the accident, testified: "In January, 1946, I lived on the Cedartown-Rockmart highway just beyond Fish Creek, six and a half or seven miles from Cedartown, on the north side of the highway. The Bellview-Fish Creek Road is three or four hundred yards east of my house. . . I got off the bus that night next to Clifford Stringer's, at my home. After I got off the bus, I started home, and the bus drove on up to its stopping place. I' walked just a few steps from the highway and a car came over the hill, coming east, coming so fast I just stopped and watched it until it passed, and I don't think I had gone over two or three steps until I heard a crash, and I waited just a minute to see and I turned and started back and I met Avery [the driver of the bus] coming running, and he wanted me to get my boy up and get him to go to town with him. I learned that the bus had been involved in a crash. After I got off the bus and started home and saw this car, no other vehicle passed before this car came over the hill. I watched this car as it came down the road. I would say it was traveling not under 80 miles per hour." Mrs. Louise Nolan testified: "I was on the bus when it reached the intersection of the Bellview-Fish Creek Road, I got off the bus after it hit. I got off the bus regularly at home, remaining on the bus after it turned off the highway and went into the Fish Creek-Bellview Road until it carried me home. When we got to where this wreck happened that night, a car was coming from toward Rockmart, meeting us. I saw this car approaching from where I was sitting. In my judgment the bus did not have sufficient time to turn across the highway in front of that car. The bus stopped and a car hit us in the back. When the car [bus] pulled up there and stopped, Mrs. York got off the bus. I think she had just got on the ground when the car hit us. I was not hurt. When the car hit the bus, the bus was knocked across the road and it hit this car that I had seen approaching from Rockmart. I don't know

how far the bus was knocked." Lex Rutledge, a passenger on the bus, testified: "I had been riding the bus ever since it had been out there, which was during most of the war. On the night of this accident I was sitting on the front seat right behind the driver. I was on the bus from the woolen mills all the way out to the Bellview-Fish Creek Road. Mr. W. C. Williams rode the bus to his home that night and got off about 500 feet this side of where the collision took place. I regularly got off the bus at my home about a half a mile from the highway. I was the last passenger off the bus. In the time I was riding this, before the night of the collision, when the bus reached this intersection it made a left-hand turn into the Bellview Road, and stopped to let passengers off after making the left-hand turn." Mrs. Levada York testified: "At the time of this accident I lived on the right side of the Cedartown-Rockmart highway, I will say 100 yards from the intersection, I don't know just how far. They always carried me to the Bellview Road and I got off and walked all the way back across the highway to my house, except on this particular night. On this particular night the weather was fair and the moon was shining." W. C. Williams, reintroduced for the defendant, testified: "After I got off the bus that night I saw the bus as it pulled off. I crossed the road after the bus pulled out; I always wait until it pulls off before I cross. I looked at the rear of the bus, I always look both ways to see if there is a car coming before I cross the road. There were lights and markers on the rear of the bus, I couldn't tell you exactly how many, six or seven, there are lights on top and two taillights. They were burning that night." Avery Tanner, the driver of the bus, testified: "There would be room enough there for me to get on the shoulder far enough to get the bus eight feet away from the center line, but I was going to make a left turn. I could have gotten entirely off the highway on a space on the Fish Creek Road on the right of the highway, but I couldn't do it and make a left turn without backing up. That night I had seven lights and two reflectors on the back of the bus. There were three on the top, two marker lights. They were working. I checked the lights the next morning after the accident and they were still working except one on the right rear, which was bursted, something had hit it. My purpose in stopping at this intersection that night was to make a left turn, meeting that car. I did not intend to park there."

The plaintiff's petition charged the defendant motor carrier with four aspects of negligence: (1) negligence per se in that the driver of the bus violated Code, § 68-314, in that he stopped or parked the bus so that it was not at least eight feet removed from the center line of the highway, which is a State-aid road; (2) negligence per se in that the driver of the bus violated Code, § 68-305, by failing to give the driver of the automobile in which the plaintiff was riding a fair opportunity to pass the bus on the highway; (3) negligence per se in that the driver of the bus violated Code, § 68-309, by unreasonably obstructing or impeding the right of travel of the driver of the automobile in which the plaintiff was riding and failing to stop or park the bus at least eight feet from the center line of the highway; (4) that there was a space 25 feet east, adjacent to the highway from where the bus was stopped or parked where the motor bus could have parked safely and entirely off the highway, and such place was apparent to the driver of the bus or could have been discovered by him in the exercise of ordinary care and his failure to use this space was a failure to exercise ordinary care.

Whether or not the defendant motor carrier could be said to have been negligent in any of these respects, the evidence shows conclusively that the automobile in which the plaintiff was riding did not reduce its speed as required by Code, § 68-303 (i) upon approaching the intersection of the highway and the Bellview-Fish Creek Road. Marvin Graces, one of the occupants of the automobile, testified for the plaintiff: "My best judgment of the speed of the car just before the collision is about 45 miles an hour. I have ridden in automobiles a lot and I think I am a pretty good judge of the speed of a car. The speed of the car just before the collision was just about the same as it had been during the balance of the evening." W. C. Williams testified for the defendant that the car passed him at a distance of approximately 500 yards from the point of the collision going "not under 80 miles per hour." The Code, § 68-303 (h), requires that, "An operator of a vehicle shall bring the same to a full stop not less than five feet from the rear of any street car or passenger-carrying bus headed in the same direction, which has stopped for the purpose of taking on or discharging passengers, and shall remain standing until such car or bus has taken on or discharged said passengers: Provided,

however, that said operator may pass such street car where a safety zone is established by proper authorities, or where said operator may pass such car at a distance of at least eight feet therefrom: and Provided further, that he shall have slowed down and proceeded cautiously."

Other evidence offered by the defendants showed that it was a moonlight night; there was nothing to obstruct the view of the driver of the automobile in which the plaintiff was riding such as would have prevented his seeing the motor bus, which, under the undisputed testimony for the defendants, was well lighted with two taillights, two marker lights, and three additional lights, all on the rear end of the bus; and that the bus could have been seen by the driver of the automobile in which the plaintiff was riding for a distance of about one half mile. While we recognize that negligence and proximate cause are exclusively questions for the determination of the jury, where only one conclusion could be reached by all reasonable and fair-minded men from the evidence, they become questions of law, and under the evidence in this case no other conclusion could be reached but that even if the defendant motor carrier was negligent as charged, and we do not find it necessary to decide this point, the negligence of the driver of the automobile in which the plaintiff was riding was the sole proximate cause of the plaintiff's injuries and the defendants were not liable under any view of the case. *Sumner* v. *Thomas, 72 Ga. App.* 351 (33 S. E. 2d, 825); *Brinson* v. *Davis, 32 Ga. App.* 37 (122 S. E. 643); *Hallman* v. *Powell, 60 Ga. App.* 342 (4 S. E. 2d, 104); *Eberhart* v. *Seaboard Air-Line Ry. Co., 34 Ga. App.* 49 (129 S. E. 12); *Central of Ga. Ry. Co.* v. *Shepard, 37 Ga. App.* 643 (141 S. E. 415); *Anderson* v. *Collins & Glennville R. Co., 47 Ga. App.* 722 (171 S. E. 384). Consequently, the verdict being demanded, the court did not err in directing a verdict for the defendants.

*Judgment affirmed. Sutton, C. J., and Parker, J., concur.*